Hillsborough,
No. 5396.

STANLEY J. BARTIS, *Ex'r, Ap't*

*v.*

JOHN C. BARTIS *& a., Ap'ees.*

Argued November 2, 1965.
Decided January 31, 1966.

*Clancy & O'Neill ( Mr. Frank B. Clancy* orally ), for the appellant.

*Stein, Cleaveland & Rudman ( Mr. Morris D. Stein* orally ), for the appellees John C. and William J. Bartis.

*Charles J. Flynn,* guardian ad litem ( by brief and orally ), for the minor children of Mildred B. LaForest.

WHEELER, J. Appeal from a decree of the probate court disallowing the will of Lena M. Bartis, late of Nashua, upon proof in solemn form. Trial by the Court ( *Loughlin,* J. ), who found "on all the evidence that the will was procured by undue in-

fluence" and dismissed the appeal. The appellant's exceptions to certain rulings during the course of the trial and to the denial of his motion to set aside the decree were reserved and transferred by the Presiding Justice.

The contested will was executed on December 27, 1961. Mrs. Bartis deceased on May 6, 1962, survived by three sons, all of whom are parties to these proceedings, a daughter Agnes B. Fezolla, and children of a deceased daughter Mildred LaForest, who were represented by the guardian ad litem. By the will Agnes B. Fezolla was bequeathed $6,000, John C. Bartis $5,000, and William J. Bartis $4,000. Certain war bonds were bequeathed to grandchildren and the residue of the estate was left to the appellant Stanley J. Bartis, who was named executor.

The inventory of the estate showed personal estate of approximately $25,000 which included a mortgage note of Stanley J. Bartis, upon which a balance of $11,464.98 was unpaid. It also showed real estate appraised at $31,000.

The executor's appeal assigned as reasons therefor that the will offered for probate was executed as required by law and not procured by undue influence, duress or fraud and should have been reaffirmed upon re-examination; and that the decree of the probate court was erroneous, unreasonable, unjust and contrary to the law and the evidence.

The evidence disclosed that the decedent, a widow, had lived for some thirty-five years in her home in Nashua. Her unmarried son, Doctor Stanley J. Bartis had lived and conducted a dental practice there for some sixteen years prior to her decease, maintaining an office next to his mother's living quarters. In March 1960, Mrs. Bartis conveyed the home to Stanley in consideration of his note and mortgage in the sum of $15,600, conditioned upon provision of a home for Mrs. Bartis therein, for life, free of any charges for rent, taxes, utilities and maintenance.

There was evidence that prior to this transaction, disposition of the house had been the subject of family discussion, in an effort to provide equal interests in the property for Mrs. Bartis' children. It could be found that Attorney Velishka, who had done Mrs. Bartis' legal business for many years, was importuned by Stanley to persuade his mother to sell the property to him, and that when Velishka declined to draw a deed for that purpose in the absence of agreement by the children to the arrangement, Stanley procured the services of Attorney Lipnick for the purpose. From the testimony of Attorney Velishka it could be found that

the relationship between Stanley and his mother was at that time "very, very bad," and that she wished to have all the children share the property equally, and felt that Stanley could not pay for it. Velishka testified that she would call him on the telephone and say, "Please come down and see me. I can't stand it any longer. He is driving me out of my mind." Velishka also testified that upon occasions when he had visited Mrs. Bartis he heard Stanley call her names that he never heard anyone call their mother, that Stanley complained of her cooking, complained that she did not want to do anything for him, and that she was over-religious; and that he had said, "To hell with her. I will buy a little home near the church. Let her go to church all she wants to, but get her out of here."

There was evidence that after the home was conveyed to Stanley, the other sons were forbidden by Stanley to come to the house, and that Mrs. Bartis was "heart broken" and depressed because they and their families no longer visited her.

When the will of December 27, 1961 was executed Mrs. Bartis was 84 years of age, and had lost the sight of one eye. She had been confined to the house for some period of time. She was deeply religious, and had attended church regularly, until she was unable to do so for the last six months of her life.

During the year 1961 Mrs. Bartis executed three wills, all of which were drafted by Attorney Lipnick at the request of Stanley. The first of these was executed on January 7, 1961, and the second on November 29, 1961. Under the January will, Agnes was bequeathed $8,000, John and William each $5,000, and Stanley the residue. The November will reduced Agnes' legacy to $6,000, and the legacy to William to $4,000. Stanley was again named residuary legatee. It could be found that the occasion for executing the contested will of December 27, 1961 was primarily for the purpose of inserting the following provision: "I have in this my last will and testament sought to be fair towards all of my living children. I have favored my son, Stanley J. Bartis, because he has been an exceptionally devoted and dutiful son giving me his time and attention and looking after me and caring for me during the many years since his return from the military service in 1946."

The evidence was that Stanley arranged for the drafting of all of the 1961 wills, although he was not present when any of them was executed. In one or more instances he furnished Attorney Lipnick with instructions as to what the provisions of the will should be.

There was evidence that during the last year or two of her life Mrs. Bartis was confused and forgetful, and under medication which was administered by or at the direction of Stanley. Her daughter Agnes, who visited her daily, would give her four or five seconal pills during a four-hour period that she was there. It could be found that Mrs. Bartis had numerous bitter quarrels with Stanley during the last few years of her life and that she did nothing without his permission. It could also be found that she depended upon him to attend to her business affairs for her, arising out of other property in Nashua which she owned and leased.

The only issue presented is whether there was evidence to warrant the finding of undue influence. "Undue influence exists only when the will power of the testator is destroyed, and his own will is borne down. His freedom of will must be so destroyed as to substitute the will of another for his own." 1 Page on Wills ( Bowe-Parker Rev. ) *s.* 15.2, *p.* 715.

In *Albee* v. *Osgood,* 79 N. H. 89, 92, the court quoted with approval from *Whitman* v. *Morey,* 63 N. H. 448, 453 in part as follows: "it is the use of such appliances and influences as take away the free will of the testator, and substitute another's will for his, so that in fact the instrument is not the expression of the wishes of the testator in the disposition of the property, but of the wishes of another . . . To vitiate or render void a will by reason of undue influence, the influence must amount to force and coercion, destroying free agency, and not merely the influence of affection, or merely the desire of gratifying another; but it must appear that the will was obtained by this coercion, — by importunity that could not be resisted; that it was made merely for the sake of peace, so that the motive was equivalent to force and fear." See also, *Knox* v. *Perkins,* 86 N. H. 66, 68.

We are of the opinion that the evidence in this case that the testatrix did not act freely was sufficient to support the finding of undue influence. *Webber* v. *Phipps,* 95 N. H. 1, 4. We cannot say that the findings of the Trial Court were erroneous as a matter of law. *Gaffney* v. *Coffey,* 81 N. H. 300; *Ford* v. *Ford,* 89 N. H. 292.

Other exceptions taken during the trial have not been briefed or argued and are taken to have been waived.

*Exceptions overruled.*

All concurred.